# IN THE DISTRICT COURT OF THE UNITED STATES
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION
### DOCKET NO. 3:04CV262-H

| | | |
|---|---|---|
| JAMES WELCOME, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM AND ORDER** |
| | ) | |
| WIX CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| _____ | ) | |

**THIS MATTER** is before the Court on the following motions and memoranda:

1. The Defendant's "Motion for Summary Judgment [with memorandum and exhibits attached]" (document #21) filed October 18, 2005;

2. The Plaintiff's "Amended Brief in Opposition [with attached exhibits]" (document #30) filed December 13, 2005;

3. Defendant's "Reply ... " (document #33) and "Motion to Strike ... the Declarations of Rodney McElhaney and Doug Passmore [and attached memorandum]" (document #34), both filed January 13, 2006;

4. "Plaintiff's Response ... to Motion to Strike ... " (document #37) filed January 31, 2006; and

5. "Defendant's Reply in Support of ... Motion to Strike ... " (document #38) filed February 13, 2006.

Having carefully considered the parties' arguments, the record, and the applicable authority, the undersigned will <u>deny</u> the Defendant's Motion to Strike, but <u>grant</u> its Motion for Summary

Judgment, as discussed below.

## I. FACTUAL AND PROCEDURAL BACKGROUND

This is an action seeking damages and equitable relief for racial discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(e)(1) ("Title VII"), 42 U.S.C. § 1981 ("§ 1981"), and state public policy.

Defendant Wix Corporation manufactures air filters for the "mobile off-highway market" at its facilities in Gastonia, North Carolina. The Plaintiff James Welcome, who is African-American, began employment with Defendant on April 11, 1986 as an Interbody Welder. In 1992, he transferred to the position of #1 Lineman, and on July 7, 1996, transferred to the position of Pleater Operator and worked the third shift at the Defendant's Dixon facility. He held the latter until his termination on May 27, 2003.

Until March 30, 2003, when he was promoted, Ron Penley was the Plaintiff's Supervisor. Mr Penley reported to Don Turner, the Area Manager, who in turn reported to Steve Renfrow, the Dixon Plant Manager. During the Plaintiff's tenure at the Dixon facility, Fred Pearson was the Human Resources Manager. Keith Wilson, the Defendant's Vice President and General Manager, had overall supervisory responsibility for the Defendant's Gastonia facilities, although the record does not reflect where his office was located.

Concerning employee discipline arising from poor work performance, it is undisputed that inspectors working in the Defendant's Quality Assurance Department examined and evaluated the pleated paper produced by Pleater Operators. When an inspector discovered product with poor quality, the inspector would prepare a Discrepant Materials Report ("DMR"). In order to assure that

management addressed the issue, the inspector then issued a Corrective Action Request ("CAR"), requiring the offending employee's Supervisor to address the poor performance with the employee and otherwise take action to correct the problem.

One of the actions a Supervisor could take in response to a DMR and CAR was to issue the employee a written warning. The Plaintiff admits that he was aware that the Defendant enforced a "progressive discipline" policy requiring the termination of any employee who received four written disciplinary warnings in any twelve-month period. In addition, two written disciplinary warnings in a twelve-month period precluded an employee from seeking a transfer to another, vacant position.

When an employee was given a written warning, he was offered an opportunity to review and sign it, and was provided a signed copy. However, if the employee refused to sign the warning, he was not provided a copy. Instead, the Supervisor would note the employee's refusal to sign. Regardless of whether the employee signed the warning, the Supervisor would then forward it to the Area Manager and the Human Resources Manager for their signatures, and the warning was placed in the employee's personnel file.

Taking the evidence in the light most favorable to the Plaintiff, prior to June 12, 2002, he had been issued four written warnings, one dated September 2, 1992 for unsafe behavior, horseplay, talking, and hugging female employees, and three for poor work quality, dated September 20, 1993, and January 12 and 30, 2001. In each instance, the Plaintiff refused to sign the warning, although he admitted in his deposition that he recalled the "incidents" upon which those warnings were based, and the warnings issued for poor work quality were accompanied by DMRs.

On June 12, 2002, a DMR and CAR were issued in response to poor quality in one of the

Plaintiff's product runs. Mr. Penley issued a written warning in connection with this incident, which the Plaintiff signed.

The next day, an opening for a Pleater Operator position on the first shift was posted on the Defendant's job bulletin board. The Plaintiff applied for the position. Doug Passmore, another third shift Pleater Operator, who is white, states in his Declaration that he heard Mr. Penley tell the Plaintiff that notwithstanding the warning issued the previous day, because Plaintiff had not received two written warnings in the previous 12 months, he was eligible to apply for the first shift position. For approximately one week, the Plaintiff was transferred – temporarily according to the Defendant – to the first shift.

The Plaintiff agrees that the move to the same job on a different shift was not a promotion but a transfer, and that, in fact, he was paid a <u>lower</u> hourly wage on first shift due to losing the "third shift differential." The Plaintiff also concedes that no one told him that the transfer was permanent, and that he knew that transfers could only be formally approved by Mr. Turner, the Area Manager, who was on vacation at the time. The first shift Supervisor, Jim Ferguson, testified in his deposition that he told the Plaintiff that the transfer was "temporary," subject to Mr. Turner's approval once he returned. It is undisputed that Mr. Penley did not post an opening on the third shift, that is, the position the Plaintiff temporarily vacated, waiting instead for Mr. Turner to approve or deny the transfer.

Upon returning to work, Mr. Turner denied the Plaintiff's request to transfer, citing the Plaintiff's past performance issues as the basis for his decision. Instead, Mr. Turner approved another third shift Pleater Operator, Brandon Adams, who is white, for the transfer. The Plaintiff testified in his deposition that he believes that he was a better Pleater Operator than Mr. Adams, and

Mr. Passmore stated in his Declaration that the Plaintiff "knew more about his job" than did Mr. Adams. The Plaintiff also offers the Declaration of Rodney McElhaney, an African-American Pleater Operator, who states that on several occasions, he asked Plaintiff for advice on how "to make production easier."

Even in the light most favorable to the Plaintiff, however, Mr. Adams had more experience working as a Pleater Operator than the Plaintiff and had never received a written warning. It is also undisputed that sometime after Plaintiff was denied the transfer but prior to his termination, discussed below, Raymond Wilson, another African-American Pleater Operator, was allowed to transfer from third shift to first shift.

In the light most favorable to the Plaintiff, shortly after being denied the transfer, he exercised his rights under the Defendant's "open door" policy and complained to Mr. Wilson, the Defendant's Vice President and General Manager, that he had been denied the transfer because of his race. Taking the Plaintiff's testimony as true, after initially expressing disbelief of the Plaintiff's complaint, Mr. Wilson initiated an investigation and later conducted a telephone conference call between himself, the Plaintiff, and Mr. Renfrow, the Plant Manager. During the call, Mr. Wilson and Mr. Renfrow advised the Plaintiff that he had been denied the transfer because two more qualified Pleater Operators had also applied for the transfer.

The Plaintiff testified that "a few weeks" after his discussion with Mr. Wilson and Mr. Renfrow, Mr. Penley told him that "[Plaintiff] was a thorn in [his] side."

On August 14, 2002, the Defendant's Quality Assurance inspectors issued a DMR and CAR related to poor work quality by the Plaintiff, who admits that Mr. Penley discussed his poor work performance with him that day and that Plaintiff signed a Verification of Review documenting that

conversation.   The Plaintiff's personnel file also contains a written warning that was dated the next day, signed by Mr. Penley, Mr. Turner and Mr. Renfrow, which bears a notation by Mr. Penley that the Plaintiff refused to sign the warning.  Mr. Penley testified that he prepared the warning and presented it to the Plaintiff, who refused to sign it.  In his deposition, however, the Plaintiff denied that Mr. Penley ever told him that a written warning was being issued.

On August 29, 2002, the Quality Assurance Department again issued a DMR and CAR related to poor work quality by the Plaintiff, which Mr. Penley and the Plaintiff discussed the on the same date.   The Plaintiff signed a Verification of Review acknowledging  the discussion and also noted in his "pleater downtime log" that he had discussed his work rules with Mr. Penley.   Mr. Penley testified that he gave the Plaintiff another written warning on this date, which the Plaintiff again refused to sign.  Although the Plaintiff testified in his deposition that Mr. Penley did not show him a written warning on this occasion either, there is a written warning in the Plaintiff's personnel file that is dated August 29, 2002 and references CAR 279 (the same CAR the Plaintiff identified in the Verification of Review), which was signed by Mr. Penley, Mr. Turner and Mr. Renfrow, and which bears Mr. Penley's notation that the Plaintiff refused to sign it.

On March 30, 2003, Mr. Penley was promoted and Andy Bone became the third shift Pleater Supervisor.

On May 11, 2003, Quality Assurance inspectors issued another DMR and CAR concerning the Plaintiff's poor work quality.   The Plaintiff does not dispute that his performance was poor on this occasion as well, and admits that Mr. Bone gave him a written warning for poor performance, which he refused to sign.

When Mr. Turner received the May 11 warning, he informed the Plaintiff that he was

terminated effective May 27, 2003 for receiving four written warnings in a twelve-month period.

Mr. McElhaney declares that he believed that the Defendant's managers were trying to find a reason

to fire the Plaintiff because there was generally "a lot of harassment and racial discrimination within

the Dixon Plant" and that they did not take seriously Mr. McElhaney's allegations that he, too, had

been a victim of racial discrimination.

Soon thereafter, the Plaintiff complained to Mr. Wilson, who advised the Plaintiff to pursue

the Defendant's peer review process. Although the record does not reflect the Defendant's

procedure for peer review or the members comprising the Peer Review Board, the Plaintiff does not

challenge the Defendant's administrative grievance process and concedes that after he "presented

his case" for peer review, on June 12, 2003, the Peer Review Board denied his request for

reinstatement.

On June 18, 2003, the Plaintiff filed an administrative charge of racial discrimination and

retaliation with the Equal Employment Opportunity Commission ("EEOC"), which sometime later,

issued the Plaintiff what is commonly referred to as a "right to sue" letter.

On May 27, 2004, the Plaintiff timely filed the instant Complaint, alleging racial

discrimination claims for failure to transfer and for wrongful termination and a claim for retaliatory

termination, all in violation of Title VII, of § 1981, and of state public policy.

On October 18, 2005, the Defendant filed its "Motion for Summary Judgment" (document

#22). As the parties have clarified in their briefs, the issues presented are (1) whether the

Defendant's decision to deny the Plaintiff's request to transfer to the first shift amounted to an

"adverse employment action," and (2) concerning the Plaintiff's wrongful termination and retaliation

claims, whether there is an issue of material fact that the Plaintiff received written warnings and

ultimately was terminated on account of his race and/or in retaliation for his first complaint to Mr. Wilson.

On January 13, 2006, the Defendant filed its Motion to Strike Mr. Passmore's and Mr. McElhaney's Declarations as inadmissible opinions and hearsay. Although, as discussed below, neither those witnesses' statements nor the Plaintiff's other evidence is sufficient to create an issue of material fact, the undersigned has considered all of the Plaintiff's evidence and, accordingly, the Defendant's Motion to Strike will be <u>denied</u>.

The Defendant's Motion for Summary Judgment has been fully briefed as set forth above and is now ripe for disposition.

## II. <u>DISCUSSION OF CLAIMS</u>

### A. <u>Summary Judgment Standard</u>

Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment should be granted when the pleadings, responses to discovery, and the record reveal that "there is no genuine issue as to any material fact and. . . the moving party is entitled to a judgment as a matter of law." <u>Accord</u> <u>Charbonnages de France v. Smith</u>, 597 F.2d 406, 414 (4th Cir. 1979). Once the movant has met its burden, the non-moving party must come forward with specific facts demonstrating a genuine issue for trial. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).

A genuine issue for trial exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). However, the party opposing summary judgment may not rest upon mere allegations or denials and, in any event, a "mere scintilla of evidence" is insufficient to overcome summary judgment. <u>Id</u>. at

249-50.

When considering summary judgment motions, courts must view the facts and the inferences therefrom in the light most favorable to the party opposing the motion. Id. at 255; Miltier v. Beorn, 896 F.2d 848 (4th Cir. 1990); Cole v. Cole, 633 F.2d 1083 (4th Cir. 1980). Indeed, summary judgment is only proper "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there [being] no genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (internal quotations omitted).

Additionally, the undersigned notes that actions for race discrimination and retaliation under 42 U.S.C. § 1981 require proof of the same elements, and through the same framework, as actions brought under Title VII of the Civil Rights Act of 1964. Accord Patterson v. McLean Credit Union, 491 U.S. 164, 186 (1989); and Mallory v. Booth Refrigeration Supply Co., 882 F.2d 908, 910 (4th Cir. 1989).

Regarding the Plaintiff's state public policy claim, North Carolina courts "look to federal decisions [in Title VII cases] for guidance in establishing evidentiary standards and principles of law to be applied in discrimination cases." N.C. Dept. of Correction v. Gibson, 308 N.C. 131, 136, 301 S.E.2d 78, 82 (1983). Accord Henson v. Liggett Group, Inc., 61 F.3d 270, 277 (4th Cir. 1995); Phillips v. J.P. Stevens & Co., Inc., 827 F.Supp. 349, 353 (M.D.N.C. 1993) ( "[t]he public policy of North Carolina expressed in N.C.G.S. § 143-422.1 et seq. is essentially identical to the public policy articulated in Title VII"); and Brewer v. Cabarrus Plastics, Inc., 146 N.C.App. 82, 551 S.E.2d 902, 904 (2001).

Accordingly, the undersigned will apply the elements and paradigm of proof established for Title VII claims to determine both the Plaintiff's § 1981 and state public policy claims.

**B.  Racial Discrimination in Failure to Transfer**

Title VII of the Civil Rights Act of 1964, 42 U.S.C. §  2000e et seq. makes it an unlawful employment practice for an employer:

> to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.

The Plaintiff may present his employment discrimination claims through either or both of "two avenues of proof."  Hill v. Lockheed Martin Logistics Management, Inc., 354 F.3d 277, 284-85 (4th Cir. 2004) (en banc).    Generally, a plaintiff "may establish a claim of discrimination by demonstrating through direct or circumstantial evidence that [unlawful] discrimination motivated the employer's adverse employment decision ... [or] proceed[ing] under [the] pretext framework" established by the Supreme Court in  McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).[1] Id.

However, "regardless of the type of evidence offered by a plaintiff as support for h[is] discrimination claim (direct, circumstantial, or evidence of pretext), or whether []he proceeds under a mixed-motive or single-motive theory, '[t]he ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination.'"  Hill, 354 F.3d at 286, quoting Reeves v. Sanderson Plumbing Prods., Inc, 530 U.S. 133, 153 (2000).

Indeed, "[t]o demonstrate such an intent to discriminate on the part of the employer, an individual alleging disparate treatment based upon a protected trait must produce sufficient evidence

---

[1]The Plaintiff has expressly submitted each of his claims solely under the alternative proof scheme established under McDonnell-Douglas,  411 U.S. at 802.

upon which one could find that 'the protected trait ... actually motivated the employer's decision.'"

Id.. See also Kubicko v. Ogden Logistics Services, 181 F.3d 544, 552 (4th Cir. 1999) (plaintiff

must show that a "factor made illegal under Title VII played a motivating part in an employment

decision").

Moreover, regardless of the method of proof, the employment discrimination laws require

as an absolute precondition to suit that some adverse employment action have occurred. Hill, 354

F.3d at 286. Accord McDonnell Douglas, 411 U.S. at 802 (to establish a prima facie case of race

discrimination in terms and conditions of employment, plaintiff must demonstrate that: (1) he is a

member of a protected class; (2) he was qualified and his job performance was satisfactory; (3) he

suffered an adverse employment action; and (4) similarly situated employees not in the protected

class received more favorable treatment); and Von Gunten v. State of Maryland, 243 F.3d 858, 865

(4th Cir. 2001).

In determining what constitutes an "adverse employment action," the Supreme Court has held

that a plaintiff must establish "a significant change in employment status, such as hiring, firing,

failure to promote, reassignment with significantly different responsibilities, or a decision causing

a significant change in benefits." Burlington Indus. v. Ellerth, 524 U.S. 723, 761 (1998). Accord

Von Gunten, 243 F.3d at 865 ("evidence that the terms, conditions, or benefits of employment were

adversely effected is the sine qua non of an adverse employment action"); Boone v. Goldin, 178

F.3d 253, 256-57 (4th Cir. 1999) (employer's decision not to transfer an employee "does not qualify

as an adverse employment action unless the decision had some significant detrimental effect on the

employee ... absent any decrease in compensation, job title, level of responsibility, or opportunity

for promotion, reassignment to a new position commensurate with one's salary level does not

constitute an adverse employment action"); Page v. Bolger, 645 F.2d 227, 233 (4th Cir. 1981) (court

has "consistently ... focused on the question whether there has been discrimination in what could be

characterized as ultimate employment decisions such as hiring, granting leave, discharging,

promoting and compensing"); and Nichols v. Comcast Cablevision of Maryland, 84 F.Supp. 2d 642,

654 (D. Md. 2000) (to demonstrate an adverse employment action, a plaintiff "must establish more

than a mere inconvenience or an alteration of job responsibilities").

Applying these legal principles to the facts in this case, and taking the record in the light most

favorable to the Plaintiff, he has failed to raise an issue of material fact as to whether the Defendant's

denial of his request to transfer to the first shift constituted an adverse employment action. Indeed,

the Plaintiff has not identified any significant differences between working as a Pleater Operator on

the first shift versus the third shift, and admits that had his request been granted, his compensation

would have been reduced. Rather, the Plaintiff's preference for first shift work, while

understandable, amounts to no more than an issue of convenience, which is clearly insufficient to

support a Title VII claim for disparate treatment. Accord Ellerth, 524 U.S. at 761; Boone, 178 F.3d

at 256-57; and Nichols, 84 F.Supp. 2d at 654.

Additionally, even if the Plaintiff could establish that the Defendant's decision to deny his

request to transfer amounted to an adverse employment action, he has been unable to show that

other, non-African-American workers were permitted transfers under apparently similar conditions.

See, e.g., McDonnell Douglas, 411 U.S. at 802 (third element of prima facie case is similarly

situated employees not in the protected class receiving more favorable treatment); and Von Gunten,

243 F.3d at 865 (same). Although in the light most favorable to the Plaintiff, he was eligible to apply

for the transfer because he had received only one written warning in the previous 12 months, the

Plaintiff has failed to show that he was as qualified as Mr. Adams, who had no prior written warnings and had more experience than the Plaintiff as a Pleater Operator. The Plaintiff has identified no other employees, other than Mr. Wilson, another African-American Pleater Operator, who were permitted to transfer from third to first shift.

For these reasons, therefore, the Defendant's Motion for Summary Judgment will be granted as to the Plaintiff's failure to transfer claim.

### C. Racial Discrimination in Employee Discipline Leading to Termination

As noted above, the Plaintiff has submitted his wrongful termination claim solely under the alternative proof scheme established in McDonnell-Douglas. Under the alternative proof scheme, if the employee establishes a prima facie case of illegal discrimination, the burden shifts to the employer to articulate some legitimate, non-discriminatory reason for its employment decision. 411 U.S. at 802. If the employer does so, the presumption of discrimination "drops from the case," and the employee must demonstrate that the employer's stated reason for its action was, in fact, a pretext for improper discrimination. Id. at 804.

The Supreme Court has made clear that the plaintiff at all times "bears the ultimate burden of proving ... intentional discrimination." Runnebaum v. NationsBank of Maryland, 123 F.3d 156, 164 (4th Cir. 1997) (en banc), citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506-11 (1993) (holding that prima facie case plus disbelief of employer's asserted justification is not necessarily sufficient to survive summary judgment). However, in Reeves v. Sanderson Plumbing Prods., Inc., the Supreme Court held that:

> a plaintiff's prima facie case, combined with sufficient evidence to find that the
> employer's asserted justification is false, may permit the trier of fact to conclude that

the employer unlawfully discriminated. This is not to say that such a showing by the plaintiff will always be adequate to sustain a jury's finding of liability.

530 U.S. 133, 147-48 (2000) (emphasis added).    Accord  Rowe v. Marley Co., 233 F.3d 825, 830 (4th Cir. 2000) ("In Reeves the Supreme Court held that when a plaintiff establishes a prima facie employment discrimination case and that his employer's explanation is pretextual, this does not automatically create a jury question, but it may do so.")

The Supreme Court went on to state in Reeves, 530 U.S. at 148,  that notwithstanding the fact-finder's disbelief of the stated, non-discriminatory  reason, an employer is still entitled to judgment as a matter of law (or, as in this case, summary judgment) "if the record conclusively revealed some other, non-discriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue, and there was abundant and uncontroverted independent evidence that no discrimination had occurred."

Finally, it is well-settled that the perception of the decision-makers alone, not a plaintiff's co-workers or other third parties, is relevant to the question of discrimination.  Accord  Tinsley v. First Union Nat. Bank, 155 F.3d 435, 444-45 (4th Cir.  1998); Evans v. Technologies Applications & Serv. Co., 80 F.3d 954, 960-61 (4th Cir. 1996); and Conkwright v. Westinghouse Elec. Corp., 933 F.2d 231, 235 (4th Cir. 1991).

Applying the McDonnell-Douglas alternate proof scheme, to establish a prima facie case of racial discrimination in the enforcement of employee disciplinary measures leading to termination, a plaintiff must show "that: (1) he is a member of a protected class; (2) he was qualified for his job and his job performance was satisfactory; (3) he was fired; and (4) other employees who are not members of the protected class were retained under apparently similar circumstances."  Bryant v.

Bell Atlantic Maryland, Inc., 288 F.3d 124, 133 (2002), citing Hughes v. Bedsole, 48 F.3d 1376, 1384 (4th Cir. 1995) and Cook v. CSX Transp. Corp., 988 F.2d 507, 511 (4th Cir. 1993).

It is undisputed that the Plaintiff is a member of a protected class, African-American, and that he was terminated. Accordingly, the Plaintiff has satisfied two elements of a prima facie case of disparate discipline leading to termination.

However, even in the light most favorable to the Plaintiff, he has failed to show that his job performance was satisfactory or that other employees who are not members of the protected class were retained under apparently similar circumstances. Concerning his work performance, the Plaintiff does not dispute that four times within 12 months prior to his termination, the Defendant's Quality Assurance inspectors identified poor work quality in the Plaintiff's production runs, generating a DMR and CAR on each occasion, which required the Plaintiff's Supervisor (Mr. Penley for the first three and Mr. Bone on May 11, 2003) to take some form of disciplinary action.[2]

Neither does the Plaintiff dispute that on those occasions his work, in fact, contained identified errors. Moreover, the Plaintiff testified that he "recalls" each "incident," including his Supervisor discussing work performance with him, and that he remembers being issued written warnings following the first and fourth incidents. As to the second and third written warnings, issued by Mr. Penley on August 15 and 29, 2002, the Plaintiff contends only that he was not shown or informed of those warnings, speculating that Mr. Penley placed them in his personnel file because of racial bias. Put simply, such speculation – with little or no objective or corroborative evidence to support it – fails to establish the third element of a prima facie case of wrongful termination.

---

[2]As noted above, these four disciplinary actions were in addition to the four disciplinary actions taken against the Plaintiff in 1992, 1993, and 2001, including two written warnings in January 2001.

Similarly, the Plaintiff has not identified a single comparator concerning his termination claim, that is, a non-African-American employee who was retained under circumstances apparently similar to those leading to the Plaintiff's termination, and therefore, cannot satisfy the final prima facie element either. As discussed above, Mr. Adams, the only white comparator offered by the Plaintiff for any purpose, was more qualified than the Plaintiff for the transfer to first shift. Otherwise, the Plaintiff relies only on his and Mr. McElhaney's generalized conclusions and subjective beliefs that the Defendant discriminated against the Plaintiff. See, e.g., Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc., 53 F.3d 55, 62 (4th Cir. 1995) (unsupported speculation insufficient to defeat summary judgment).

In sum, because he has failed to establish that his job performance was satisfactory or that a non-African-American employee was retained in circumstances apparently similar to those which led to his termination, the Plaintiff has likewise failed to established a prima facie case of disparate discipline leading to termination.

Even assuming arguendo that the Plaintiff had made out a prima facie case of discrimination, and thereby shifted the burden of production to the Defendant to articulate a legitimate, nondiscriminatory reason for the Plaintiff's termination, he has wholly failed to show that the Defendant's stated reason for his termination was pretextual. The Defendant maintains that the Plaintiff was terminated for poor performance, that is, receiving four written warnings in 12 months in violation of a published policy. In other words, the Defendant has "articulate[d] some legitimate, non-discriminatory reason for its employment decision." McDonnell-Douglas, 411 U.S. at 802. For the reasons discussed above, however, the Plaintiff is unable to establish that the Defendant's stated reason is "merely pretextual" or to carry his "ultimate burden of proving intentional

16

discrimination." Runnebaum, 123 F.3d at 164, citing, St. Mary's Honor Ctr., 509 U.S. at 506-11.

For these reasons, the Defendant's Motion for Summary Judgment must also be granted as to the Plaintiff's wrongful termination claim.

### D. **Retaliation**

In addition to prohibiting harassment or discrimination in the workplace on the basis of sex, race, religion, or gender, Title VII of the Civil Rights Act of 1964 prohibits employers from retaliating against employees who attempt to enforce their rights under the Act. 42 U.S.C. § 2000e-3(a).[3]

To establish a prima facie case of retaliation in violation of Title VII, an employee must show that: 1) the employee engaged in protected activity; 2) the employer took adverse employment action against the employee; and 3) a sufficient causal connection existed between the protected activity and the adverse action. McNairn v. Sullivan, 929 F.2d 974, 980 (4th Cir. 1991), citing Ross v. Communications Satellite Corp., 759 F.2d 355, 365 (4th Cir.1985), abrogated in part on other grounds by Price Waterhouse v. Hopkins, 490 U.S. 228 (1989). See also Hopkins v. Baltimore Gas and Electric Company, 77 F.3d 745, 754 (4th Cir. 1996); and Williams v. Cerberonics, Inc., 871 F.2d 452, 457 (4th Cir. 1989).

---

[3] Title 42 U.S.C. §2000e-3 specifically provides as follows:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment, for an employment agency, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

Generally, once a plaintiff has made the required prima facie showing, the burden shifts to the employer to produce a "legitimate nondiscriminatory reason for the adverse action, thereby rebutting the presumption of retaliation raised by the prima facie case." Ross, 759 F.2d at 365, citing Womack v. Munson, 619 F.2d 1292, 1296 (8th Cir. 1980).

If the employer satisfies this burden of production, "the employee bears the ultimate burden of proving retaliation by demonstrating that the employer's proffered reason is pretextual" and that the real motive for the employment action was retaliation. Id., citing Womack, 619 F.2d at 1296. Accord St. Mary's Honor Ctr., 509 U.S. at 506-11.

Essentially, to prove retaliation a plaintiff must establish that the adverse action would not have occurred "but for" the protected activity. Id. at 365-66. "A causal relationship requires more than simple coincidence... Causation requires [that] the employer's action be the consequence of the protected activities and of nothing else." Bray v. Tenax, 905 F.Supp. 324, 328 (E.D.N.C. 1995).

The Plaintiff is not required to establish the validity of the underlying allegations of a Title VII violation; nonetheless, in order to establish a retaliation claim, "the plaintiff must believe in the validity of the claim, and that belief must be reasonable." Childress v. City of Richmond, 907 F.Supp. 934, 940 (E.D. Va. 1995), aff'd 134 F.3d 1205 (4th Cir. 1998) (*en banc*), cert. denied, 118 S.Ct.2322 (1998). Accord Mayo v. Kiwest Corp., 898 F.Supp. 335, 337 (E.D.Va. 1995).

In the present case, as the parties agree in their briefs, the Plaintiff engaged in a single "protected activity" prior to his termination, that is, he complained to Mr. Wilson that he was denied a transfer to the first shift because of his race. See 42 U.S.C.A. § 2000e-3(a) (defining "protected activity" as "participating in an ongoing investigation or proceeding under Title VII, or... opposing discriminatory practices in the workplace" and defining "participation" as "(1) making a charge; (2)

testifying; (3) assisting; or (4) participating in any manner in an investigation, proceeding, or hearing under Title VII"). Accord Laughlin v. Metropolitan Washington Airports Authority, 149 F.3d 253, 259 (4th Cir. 1998) (same). It is also undisputed that subsequent to the Plaintiff making this complaint, the Defendant took adverse employment actions against him when it placed written warnings in his personnel file leading ultimately to his termination. The Plaintiff's ability to establish a prima facie case depends, therefore, on whether there was a causal link between his protected activity and the warnings and his termination.

The Plaintiff's evidence clearly fails to create a genuine issue of material fact as to this final element. In other words, for the same reasons his evidence fails to show that the Defendant's decisions to discipline and ultimately terminate him amounted to racial discrimination, he has similarly failed to show that these decisions were in any way connected to his first complaint to Mr. Wilson. Indeed, although the Plaintiff denies that Mr. Penley showed him written warnings on August 15 and 29, 2002, it is undisputed that four written warnings were placed in his personnel file during his final 12 months of employment. Nor does he deny the work quality concerns that gave rise to the inspectors' DMRs and CARs upon which all four written warnings were based, and he admits that both Mr. Penley and Mr. Bone counseled him about his ongoing, poor performance.

For these reasons, the Defendant's Motion for Summary Judgment on the Plaintiff's retaliation claim must likewise be granted.

### III. ORDER

**NOW, THEREFORE, IT IS HEREBY ORDERED:**

1. The Defendant's "Motion to Strike" (document #34) is **DENIED**.

2.    The Defendant's "Motion for Summary Judgment" (document #21) is **GRANTED**; and

the Complaint is **DISMISSED WITH PREJUDICE**.

3.    The Clerk is directed to send copies of this Memorandum and Order to counsel for the

parties.

**SO ORDERED, ADJUDGED AND DECREED**.

Signed: February 17, 2006

Carl Horn, III
United States Magistrate Judge